KRAVITCH, Circuit Judge:
The creditor trustee of the estate of the bankrupt Chase & Sanborn Corporation appeals the dismissal of a claim filed pursuant to 11 U.S.C. § 548 seeking the avoidance of an allegedly fraudulent transfer of $350,000 that was channeled through an account of the debtor corporation as part of a scheme to repay a personal debt of the corporation’s sole owner. The trustee also challenges discovery and evidentiary rulings made by the bankruptcy court and affirmed by the district court. We conclude that the debtor corporation was a mere conduit for repayment of the owner’s personal loan and, consequently, that the *1179 contested $350,000 was not the “property” of the debtor corporation. The transfer of the funds thus is not subject to avoidance. We further find that the discovery and evidentiary rulings, if error, do not warrant reversal. Accordingly, we affirm the judgment of the district court.
I. BACKGROUND
The creditor trustee’s claims concern one of a series of related financial transactions accurately described by the bankruptcy court as “bewildering.” The central character was Alberto Duque Rodriguez (Duque), a Colombian citizen living in Miami. Duque was the president and sole owner of a limited partnership, Domino Investments (Domino), which in turn owned all the stock of the debtor, Chase & Sanborn, also known as the General Coffee Corporation. Duque also was chairman of the board and the majority stockholder of defendant City National Bank (CNB).
In 1983, Duque and his companies encountered severe financial difficulties. On April 29 of that year, defendant Carlos Londono, a personal friend of Duque, borrowed $2 million from defendant CNB and immediately endorsed the check over to Duque. The purpose of the loan to Londono apparently was to enable Duque to obtain the money through an unsecured loan despite federal regulations preventing him, as an owner of the bank, from doing so. Duque sent the $2 million to a Colombian coffee company, where its trail ends.
The story resumed on May 9, when Duque personally borrowed $5 million from Arab National Bank. Some of this money would follow a circuitous route until it eventually would be used to repay Londono’s loan from CNB. Initially, $660,000 of the $5 million was sent to Domino. At that point a critical snag arises in the story. The defendants contend, and the bankruptcy court found, that the $660,000 was transferred to General Corporation of Coffee, a separate, previously defunct entity whose account recently had been reopened solely for the purpose of laundering this money. The creditor trustee contends that Domino transferred the $660,000 to Chase & Sanborn via an account of its alter ego, General Coffee Corporation, which at one time was known as General Corporation of Coffee. The parties stipulated that the account was opened only days before the transfer took place and that it was closed only days afterward. The trustee claims, with considerable support in the record, that about $310,000 of this money was transferred to regular accounts of General Coffee Corporation, where it was used to pay salaries and lawyers.
The parties all agree that the remaining $350,000 — the center of this entire controversy — was gratuitously transferred to defendant Carolina Sanchez, Duque’s personal secretary, within two days after it arrived in the newly opened account. Sanchez immediately wired to Londono that $350,000, as well as another $1.65 million from Duque’s Arab Bank loan that had been funneled to her by other means. Londono used this $2 million to repay his CNB loan.
The entire scheme took about three weeks from start to finish. Two days before Londono repaid CNB, Duque declared bankruptcy, as did Chase & Sanborn and other of Duque’s corporate entities. Duque subsequently was charged with fraud; he has refused on fifth amendment grounds to testify in the bankruptcy proceedings. Duque is not a party in this action. Defendant Sanchez has not been located.
A Chapter 11 plan of reorganization was filed for Chase & Sanborn in June 1984, and was confirmed by the bankruptcy court in August 1984. In May 1985, the individual selected as creditor trustee filed this action along with more than sixty other such actions related to the Chase & San-born bankruptcy. The parties have stipulated that Chase & Sanborn was insolvent during the events at issue.
*1180 n.
The gravamen of the creditor trustee’s claim[1] is that the funds in controversy became the property of Chase & Sanborn upon their arrival in the account of General Corporation of Coffee, and thus that the gratuitous transfer of the $350,000 to defendant Sanchez is avoidable as either actual or constructive fraud.[2] In denying the claim, the bankruptcy court concluded that the trustee had failed to establish that the funds were the property of the debtor. The court based this conclusion on its factual finding that the General Corporation of Coffee, into whose account the funds were entered, was an entity separate and distinct from Chase & Sanborn/General Coffee Corporation. This finding was affirmed by the district court.
The creditor trustee attacks the finding as clearly, erroneous. We agree. Except for a single, unsupported remark at trial by counsel for defendant Londono, the record is devoid of any evidence to substantiate the finding. By contrast, the record contains uncontroverted evidence that the account was an operating account of the debtor corporation. The evidence demonstrated, for example, that “General Corporation of Coffee” was the name by which General Coffee Corporation previously was known. The account itself was used to pay a variety of Chase & Sanborn's expenses, including salary and legal expenses. The $350,000 transfer to Sanchez, moreover, was ordered by Chase & Sanborn’s president in a letter on the corporation’s stationery.
Despite our determination that the bankruptcy court was clearly erroneous in the factual finding that served as the basis for the court’s decision, we affirm the dismissal of the action by the courts below. Although the debtor corporation had possession of the funds in controversy by virtue of the transfer to the account, the record demonstrates that the debtor corporation did not have sufficient control over the funds to warrant a finding that the funds were the debtor corporation’s property. This conclusion is based upon our resolution of what appears to be an issue of first impression in this or any other court. No court, so far as we have discovered, previously has established a framework for determining when funds provided to a debtor by a third party become property of the debtor so that an allegedly fraudulent transfer of the funds to a noncreditor is subject to avoidance under 11 U.S.C. § 548.
In support of the contention that the payment to Sanchez is avoidable as a *1181 fraudulent transfer of the debtor’s property, the creditor trustee here relies exclusively on cases involving preferential transfers to creditors, see 11 U.S.C. § 547, where the source of the payment was a party other than the debtor. The germinal case on this issue established the rule that a payment to a creditor generally is avoidable as a preference unless the defendants demonstrate that the other party “controlled the application of the funds” by providing the monies “only on condition that a particular creditor receive the proceeds.” Smyth v. Kaufman, 114 F.2d 40, 42 (2d Cir.1940). Thus, where a debtor has paid existing debts, the funds used as payment are presumed to be the debtor’s property absent some proof to the contrary offered by those defending the transfer. See, e.g., Larose v. Bourg, 45 B.R. 693, 697 (Bktrcy.M.D.La.1985) (funds transferred to debtor’s bank account without restriction on use “became property of the Debtor, since the Debtor had legally unrestricted rights to use the funds as it saw fit”); cf. Broten v. First Nat’l Bank of Little Rock, Arkansas, 748 F.2d 490 (8th Cir.1984) (per curiam) (checks from comakers of loan made payable to debtor but handed directly to creditor bank not within control of debt- or and thus not property of debtor’s estate).
The rules established in the avoidable preference cases are applicable to a certain extent in the context of fraudulent transfers. The purpose of avoidance of both types of transfers is to prevent a debtor from diminishing, to the detriment of some or all creditors, funds that are generally available for distribution to creditors. Consequently, any funds under the control of the debtor, regardless of the source, are properly deemed to be the debt- or’s property, and any transfers that diminish that property are subject to avoidance.
Due to critical differences between the two types of transfers, however, the standards for establishing control by the debtor in the context of avoidable preferences are not entirely apposite in section 548 challenges of a transfer to a noncreditor. Avoidable preferences arise in a situation in which it is logical to presume that the debtor in fact controlled the funds paid out: the debtor, after all, was under an existing obligation to make the payment. The presumption that the debtor controlled the payment is not similarly compelling where funds provided by a third party are transferred to a noncreditor. By definition, such transfers are not effected to repay an existing obligation of the debtor. Indeed, such transfers do not provide any benefit whatsoever to the debtor. Thus, as a general matter, it is as likely that the party providing the funds would instigate the transfer as it is that the debtor would do so.
Moreover, in contrast to avoidable preferences, the purpose of avoiding fraudulent transfers is not so clearly served by a presumption that the debtor controlled the transaction. With preferential transfers, the purpose of avoidance — fairness among the creditors — is directly implicated by the very fact of a transfer to a certain creditor, regardless of the source of the funds. This concern with fairness among creditors is not similarly present, however, where the debtor makes a fraudulent transfer to a noncreditor. Fraudulent transfers are avoidable because they diminish the assets of the debtor to the detriment of all creditors. Presuming control from the mere fact of transfer thus begs the essential question presented by section 548 claims: did the transfer diminish the assets of the debtor? Furthermore, presuming control under such circumstances poses the distinct danger that creditors could receive a windfall in the form of funds that simply passed through the debtor’s possession but in fact were not the property of the debtor.
For these reasons, we conclude that where a transfer to a noncreditor is challenged as fraudulent, more is necessary to establish the debtor’s control over the funds than the simple fact that a third party placed the funds in an account of the debtor with no express restrictions on their use. In determining whether the debtor had control of funds transferred to a non-creditor, the court must look beyond the *1182 particular transfers in question to the entire circumstance of the transactions.
Here, the circumstances of the transactions clearly demonstrate that the debtor corporation did not control the funds transferred to defendant Sanchez. The source of the funds was the personal loan obtained by Duque from the Arab National Bank. Their eventual use was to repay the loan obtained for Duque by Londono from the City National Bank. Between these ends, the transfer was part of a larger, complicated scheme involving numerous transactions among several corporate entities in Duque’s then-fading financial empire. In this context, the actual connection between the funds and the debt- or was quite tangential: a two-day layover in a special account then only recently opened and soon thereafter closed. The account, moreover, was opened under a name that the debtor no longer used.
In light of these facts, neither the use by the debtor of some of the funds for its own purposes nor the fact that the debtor’s president ordered the transfer can overcome the overwhelming evidence that Duque, not Chase & Sanborn, controlled the transfer at issue. Accordingly, we conclude that the funds were not the property of the debtor, and thus that the transfer is not avoidable. To conclude otherwise would confer on the creditors a windfall at the expense of the named defendants who, as the creditor trustee admits, were innocent of any intent to diminish the assets of the debtor.[3]
III.
In addition to contesting the bankruptcy court’s finding that the transferred funds were not the property of the debtor, the creditor trustee challenges evidentiary and discovery rulings by the bankruptcy court. We reject both claims.
The creditor trustee first challenges the bankruptcy court’s refusal to allow the trustee to testify after the trustee suddenly was taken ill during the trial. The trustee claims that by refusing either to grant a continuance or to permit supplementation of the record, the court excluded evidence that would have established that the account into which the contested funds were placed was an operating account of the debtor and not that of a distinct entity. In view of our determination, based upon the stipulated facts, that the bankruptcy court was clearly erroneous in finding that the account was not the debtor’s, the court's refusal to continue the trial or to supplement the record, if error, was harmless.
The creditor trustee also challenges the bankruptcy court’s refusal to impose discovery sanctions against defendant City National Bank for failing to produce a representative for a scheduled deposition. CNB contends that it did not refuse to produce a representative, but that the time allocated for discovery “simply ran out” prior to trial. The bankruptcy court rejected the creditor trustee’s motion for sanctions without a hearing on the ground that, by conducting discovery only the week before trial was scheduled, the parties had waited “too late.”
The decision to impose or deny discovery sanctions is within the discretion of the trial courts. This court will reverse a decision concerning sanctions only for a clear abuse of that discretion. See, e.g., Carlucci v. Piper Aircraft Corp., 775 F.2d 1440, 1447 (11th Cir.1985). Even if the bankruptcy court here would have been warranted in imposing sanctions, the refusal to do so was not a clear abuse of discretion.

IV.

For the foregoing reasons, the decision by the district court below is AFFIRMED.

. Defendant CNB contends that the creditor trustee does not have standing to assert the claim under § 548 because he is neither a trustee in bankruptcy, see 11 U.S.C. § 548(a) (“The trustee may avoid any transfer in property____”), nor a debtor in possession, see 11 U.S.C. § 1107 (granting debtors in possession substantially similar rights as trustees in bankruptcy). The bankruptcy court concluded, however, that the creditor trustee was the proper party to bring the action, as a trustee had not been appointed under the Chapter 11 reorganization plan and the debtor in possession had interests in common with the defendants in this case. The court permitted the creditor trustee to assert the claim pursuant to the court’s authority under 11 U.S.C. § 1123(b)(3)(B) to appoint a "representative of the estate” to enforce any claim or interest. CNB argues, however, that the creditor trustee was not, in fact, “appointed” by the court to enforce the claims. We And this argument without merit. Although the court did not formally and specifically appoint the creditor trustee to enforce the claims, the reorganization plan approved by the court recognized that the creditor trustee would have the responsibility of pursuing claims of the debtor. The court’s approval of a plan granting this authority to the creditor trustee was suAicient, under the Bankruptcy Code, to confer on the creditor trustee standing to assert this claim.

. Section 548(a)(1) concerns transfers that tire intentionally fraudulent; § 548(a)(2) involves constructively fraudulent transfers. Section 548(a) provides in pertinent part:
(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
(2) (A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(B)(i) was insolvent on the day that such transfer was made or such obligation was incurred

. Due to our determination that the funds in issue were not the property of the debtor, we need not consider the bankruptcy court’s alternative ruling that the creditor trustee failed to demonstrate the intent necessary to establish a successful claim under § 548(a)(1).